

# Burton & Associates

FORENSIC AND ENVIRONMENTAL PATHOLOGY AND MEDICINE

Joseph L. Burton, M.D.

# BERNARD VS. MITSUBISHI

## Burton & Associates Case No.: 07-502

**Prepared for: Michael Strickland**

**Report date: January 16, 2007**

**Report by: Paul Lewis, Jr.,** MS BME

**(Signature line)**



DEFENDANT'S EXHIBIT
D

Page 2
07-502
Report

## <u>Report Table of Contents:</u>

1.    **Section #1: Introduction (Qualifications and Methodology), page 3.**

2.    **Section#2: Statement of Issues to be Addressed, Database and Summary of Pertinent Materials, pages 4-19.**

3.    **Section #3: Opinions and Support for Opinions, pages 20-37.**

4.    **Section #4: Consideration for the Potential of Error, pages 38-40.**

Page 3
07-502
Report

# Section #1: Introduction

I have been asked to review this case in order to determine the mechanism by which the fatal injuries occurred to Dora Bernard Parker, the driver of a 2003 Mitsubishi Montero that was involved in a rollover incident on March 7, 2004 in the State of Alabama.

In my review of this case and in forming my opinions I have utilized the Scientific Method of Investigation.

The Scientific Method requires the following:

1. A statement of the problem.
2. An orderly review and course of study involving the collection of facts, data and information concerning the problem to be addressed.
3. The formation of an opinion or hypothesis based on the evaluation of the above.
4. Testing the validity of the hypothesis. Such testing may take numerous and varied approaches and does not necessarily require some physical or mechanical test procedure.
5. Consideration for the potential for error in the conclusions and opinions stated.

**(End Section 1)**

Page 4
07-502
Report

## Section #2:

## Statement of Issues to Be Addressed:

1)  I have been asked to define the injuries sustained by Dora Parker in as much
    detail as possible based on the currently available information and records.

2)  I have been asked to determine whether Dora Parker was utilizing the vehicle's
    belt restraint system and utilizing it appropriately.

3)  I have been asked to specifically determine the mechanism by which Dora Parker
    received fatal injuries as the consequence of the subject incident and to relate
    these injuries and how they occurred to the vehicle dynamics and kinematics.

4)  I have been asked to determine whether these injuries occurred inside the
    occupant space or exterior to the occupant space of the vehicle during the rollover
    crash.

5)  I have been asked to determine whether the apparent opening of the left side door
    of the subject vehicle is proximally related to Dora Parker's injuries.

6)  I have been asked to determine whether Dora Parker would have sustained the
    obvious complete amputation of her upper body from her lower body had her
    head, torso and extremities been fully contained within the occupant survival
    space of the subject Mitsubishi Montero.

## Database:

In arriving at my present opinions I have considered the following information:

1)  ALABAMA UNIFORM TRAFFIC ACCIDENT REPORT
2)  DEATH CERTIFICATE FOR DORA PARKER BERNARD
3)  COLOR LASER COPIES OF SCENE PHOTOGRAPHS
4)  4 CDS OF PHOTOGRAPHS.
5)  COMPLAINT.
6)  ANSWER OF DEFENDANT MITSUBISHI MOTORS.
7)  ANSWER OF DEFENDANT TK HOLDINGS.
8)  ANSWER OF DEFENDANT IRVIN AUTOMOTIVE PRODUCTS
9)  ANSWER OF TAKATA SEATBELTS
10) ANSWER OF DEFENDANT TAKATA RESTRAINT SYSTEMS
11) SWORN STATEMENT OF RAY CANTRELL.
12) TAKATA'S PRODUCTION IN RESPONSE TO DISCLOSURE.
13) PHOTOGRAPHS FROM KEN BROWN'S VEHICLE INSPECTION.
14) OSI INFORMATION

Page 5
07-502
Report

Additionally, I have considered my personal inspection of the subject vehicle and surrogate study performed on January 12, 2007 at Weil Wrecker Service in Birmingham, Alabama.

## Summary of Pertinent Materials from Above Listed Database:

**\* This summary is not necessarily my opinion of the precise manner in which this crash occurred. It is simply a summary of the pertinent data as determined from the actual file materials. This accident report is only the opinion of the officer who created it. Although much of the contents of this report may be consistent with my own final opinions and those of other reconstructionists, the incorporation of this crash report into my database does not indicate that I have adopted it in its entirety as correct.**

### 1) ALABAMA UNIFORM TRAFFIC ACCIDENT REPORT:

This accident occurred on Sunday, March 7, 2004 at 10:20 a.m. on Interstate 65 in Alabama between AL-185 and Bishop Bottom Road.

I-65 is a four lane north/south running interstate separated by a grass median with no apparent defects.

The speed limit in the area of the accident was 70 and the estimated speed of the vehicle was 76 mph.

The weather condition was dry, the surface construction was asphalt, the road character was straight and level, the weather was clear, and it was daylight.

Vehicle 2003 Mitsubishi Montero four door SUV.

Driver #1: Dora Bernard Parker, 59 year old female, she is fully ejected, she is listed as airbags not deployed, belts used, and she was killed in the accident.

She was taken to Bell's Funeral Home.

The police were notified at 10:23 a.m. and the police arrived at 10:49 a.m.. EMS arrived at 10:35 a.m.

Per the officer's narrative:

Unit number one was traveling southbound on Interstate 65 within the inside lane. For reasons unknown unit number one swerved to the left at which time it entered into the unpaved grass median. As unit number one continued its movement, it then began to rotate in a clockwise direction out of control over turning approximately four times coming to final rest upright facing east. Between first roll over and final rest, the driver

Page 6
07-502
Report

side door came open at which time the driver was partially ejected. The driver was then cut in half from waist down as the vehicle contacted the ground during roll over becoming fully ejected from the vehicle. The driver side seatbelt was buckled indicating the driver was wearing it at the time of the collision. There wasn't any additional evidence present on the scene indicating any other vehicles involvement. The distance traveled from the first roll over to final rest is approximately 292 feet.

There is a diagram depicting the narrative. Marked on the diagram is where the "final rest of upper torso" and also rest of the lower torso.

### 2)  <u>RECONSTRUCTION INFORMATION FROM RUDY LIMPERT:</u>

Preliminary reconstruction information obtained from Engineer Rudy Limpert is as follows:

> The rollover began with the driver's side leading.  The vehicle became airborne rotating counterclockwise (as viewed from the rear of the vehicle).  The vehicle impacted the ground with the upper left D-pillar.  This ground contact may also have involved the right rear upper D-pillar to a lesser degree than the left upper D-pillar.  The vehicle slid on its driver side backwards.  The vehicle rotated in air such that it impacted the ground with the right side roof edge C, B and A-pillar and upper right front fender.  This major impact caused the vehicle to become airborne rotating approximately 540 degrees about its longitudinal axis, and approximately 180 degrees about its lateral axis.  During this period the vehicle assumed significant angular velocity for the door to open and the upper torso of the driver to be ejected.  The driver's side of the vehicle came in contact causing the upper edge of the driver door skin to be peeled down as well as the left rear door skin to be torn off.  The left rear bottom corner contacted the ground, followed by right rear bottom corner ground contact in water/mud area without causing major damage.  Finally, the vehicle came to rest on its wheels facing west/north.  The number of rollovers was at least three, and probably not more than five.

### 3)  <u>DEATH CERTIFICATE FOR DORA PARKER BERNARD:</u>

The manner of death is listed as "Auto Accident". No other additional significant information is contained in the death certificate.

### 4)  <u>REVIEW OF SCENE PHOTOGRAPHS:</u>

There is a photograph that is showing the driver's interior of the vehicle and the driver's seat which shows the driver's latch plate still engaged in the buckle and the webbing somewhat slack and loose with the lap belt extending horizontally out to the door panel and what appears to be outside the door opening.

Additionally in this photograph there appears to be some torn clothing article that appears to be blood stained and is trapped between the door and the B pillar.

Page 7
07-502
Report

The upper portion of the door trim panel has also been broken off.

The buckle stalk also has the appearance of being pulled laterally to the left or outboard.

Other photographs of the interior of the vehicle does not reveal any major damage or deviation of any of the interior components of the vehicle associated with Mrs. Benard's body moving about the interior of the vehicle.

The driver and passenger side airbags have not deployed although the module cover has popped loose for the passenger side airbag.

There are several photographs showing the upper torso lying on the grass at the scene. One of these also has a piece of what appears to be possibly the upper door interior trim panel for the driver's door or some lower trim along the driver's side of the vehicle lying next to this part of the body.

All of the window glazing has been broken out throughout the vehicle including the upper body of the windshield which has fallen loose.

The exterior skin for the left rear door has been torn off.

The greatest amount of roof deformation appears to have occurred over the right front passenger seated position.

In fact, the major forward deformation on the driver's side is at the B pillar.

In fact, most of the headrests are in full up position and don't appear to be deformed.

The driver's seat is more forward on the tracks as compared to the passenger seat.

The median has a gradual slope going down into the drainage portion of the ditch.

It is a grassy terrain that is relatively smooth and soft.

It also appears that the median is fairly wet with water standing in the bottom of the ditch near where the vehicle's final rest point is.

There are furrow marks that is shown all through roadway up to the point of the wheel lift.

## 5) **NOTES MADE AT THE TIME OF VEHICLE INSPECTION (LISTED AS DICTATED AT TIME OF EXAM):**

The vehicle in question is a 2003 Mitsubishi Montero four-door SUV. The vehicle has VIN # JA4LS21H43J001667.

Page 8
07-502
Report

**EXTERIOR EXAM:**

FRONT OF MOTOR VEHICLE:

All of the front grille work and headlight assemblies have been broken out.

The front bumper fascia exhibits twisting and distortion as well as some abrasion.

The hood exhibits numerous buckles and bends and folds associated with the roll.

The right hinge has been broken off completely. The left one is still intact.

Along the right side there is actually inboard dishing and creasing of the hood edge.

The windshield is multi-fractured and is falling out from its upper boundary. All of these are stress induced fractures.

There is significant downward deviation of the front header primarily in front of the #3 position.

The right A pillar is bowed down and inboard and has a fairly sharp inboard bow or bend at the midline.

The left A pillar has some downward and inboard deviation although not as significant as that on the right side.

LEFT SIDE OF MOTOR VEHICLE:

The left front quarter panel exhibits buckling associated with the roll.

The left front tire and wheel assembly are in place and partially inflated and there is no major damage to the rim. There is some mud embedded in the holes in the hub.

The driver's door is presently shut, however, appears to have come open during the crash.

The front leading edge of the door exterior skin has been deformed down and somewhat outward in relation to the inboard interior skin.

There is also mud and grass debris all embedded in this area of the door.

There are numerous abrasions on the exterior of the door. Some are nearly longitudinal in orientation and others with some differing angles.

There is mud embedded around the release exterior handle.

Page 9
07-502
Report

There is some slight outbowing and upward turning or pulling of the lower edge of the door in relation to the opening.

The window frame has been torn loose at its upper rear connection.

The upper rear frame support is somewhat displaced rearward.

There are numerous areas of dirt and grass embedded within the door opening area where the window frame used to be.

The longer portion of the window frame is twisted and distorted in many ways and there are some glass fragments still in some portions of the channel and the carrier appears to have been up.

The upper and rear portion of the window frame for the left rear door has also been torn off.

The exterior skin for the left rear door is torn off.

The left rear door is closed and will not open and is somewhat jammed in place.

There is inboard movement of the B pillar.

There is slightly more inboard movement of the C pillar.

The D pillar exhibits numerous buckles and undulations and compression associated with ground contacts with dirt and grass embedded in the upper portion.

The D pillar also has not only a compressed look but is somewhat deviated inboard and forward.

The left tail lamp assembly has been shattered out.

The fuel filler lid is bent and rotated forward and has a large amount of mud embedded in it.

The rocker sills are straight.

There is a tubular running board that is still in place but has been deviated in and under the rocker.

The left rear tire and wheel assembly is in place and fully inflated. There is no damage to the tire or rim and it is heavily embedded with grass and mud or dirt.

There is some damage to the rear quarter associated with the roll as well.

Page 10
07-502
Report

The luggage rack has been torn off on this side.

There is some inboard movement of the roof rail from front to back.

The left rear quarter window glass has been shattered out.

The left rear door window glass and opera window have also been broken out.

REAR OF MOTOR VEHICLE:

The vehicle has a temporary license plate with April '05/04.

The rear hatch glass has been shattered out.

There is some downward deviation of the left side of the hatch associated with ground contact at the upper rear header.

The hatch is no longer latched and will open but the shock struts don't appear to still hold it up.

There is some twisting distortion of the hatch as well.

The high mount third brake light is intact and unfractured.

The rear bumper is in place. The red reflector lens on the left has been broken out and there is upward deviation of the fascia from ground contact. The reflector lens on the right is in place and undamaged.

The right tail lamp assembly is in place and undamaged.

RIGHT SIDE OF MOTOR VEHICLE:

The right A pillar exhibits some compressive buckling although not quite as much as the left.

There is some slight damage to the rear quarter area on this side as well.

The C pillar doesn't exhibit any significant deformation.

The B pillar does exhibit an outward bowing at the belt line with corresponding down and inward movement of the roof rail.

As previously stated there is significant deformation of the right A pillar.

The rocker sills are straight.

Page 11
07-502
Report

The running board on this side is intact and undeformed.

Both right side doors will open and close.

The right front door window frame or window glass has been shattered out but was in the full up position based on glass fragments throughout the channel and the window frame is somewhat shifted rearward overlapping the leading edge of the right rear door window frame.

The right rear door window glass has been shattered out and was in the full up position based on glass fragments throughout the channel. The opera window is intact and unfractured.

At the B pillar hinge pillar area there is an outward bowing as previously stated of the pillar but the doors still latch and operate.

The side-view mirror housing and glass have been torn off and there is a lot of grass and mud embedded in the portion that is still left.

The right front quarter panel exhibits buckling and inward deviation associated with contact with the ground during the roll.

Both right side tire and wheel assemblies are in place and inflated and show no major damage to the tire or rims.

The large rear quarter window glass on this side has been shattered out.

The luggage rack on this side is still in place and compressed down into the roof.

There is grass and mud embedded in the top portions of both right side door window frames.

## INTERIOR EXAM:

In the rear cargo area of the vehicle is found the front grille work which is unfractured.

Also the exterior skin for the left rear door is here.

The upper portion of the driver's door interior trim panel is in the rear and has some deformation along the arm rest portion. This also appears to be the structure that was laying next to the upper torso at the scene.

The driver's visor is in the back and the vanity mirror is unfractured.

Both the headlight assemblies are also in place and are in the back.

Page 12
07-502
Report

The rear seat is a fold down bench seat with adjustable headrests at the two outboard positions.

The #4 headrest is somewhat more down on the inboard than the outboard.

The #6 headrest is full-up and undamaged.

There is no damage to the rear seatback or cushion.

The left rear door interior trim panel is in place and has a fracture along the armrest and is somewhat most probably associated with the foreshortening of the door.

Again the #4 headrest is basically adjacent to the inward moved roof rail.

The rear toe pan areas are well maintained.

The right rear door interior trim panel is in place and unremarkable for any damage.

The front toe pan areas are well maintained.

The glove box is presently ajar but exhibits no damage or fracturing.

The right side of the dash is essentially pristine other than some compression right at the outer most edge where the A pillar is compressed down on it.

The directional air louver is in place and undamaged.

There is a passenger side airbag that deploys out of the face of the dash that has not deployed, however, the cover has popped loose and it is just resting on top of the folded bag underneath.

The passenger visor is still in place and has a vanity mirror that is unfractured.

There is a recessed passenger assist grip in the roof rail above the #3 position that is undeformed.

The center portion of the dash exhibits no damage either from occupant or crash forces.

There is a center console between the two front seats that exhibits no fracturing or any deviation to the right or left.

The emergency parking brake lever and automatic gear shift lever are undamaged.

Just to the left of the gear shift lever there is a cell phone cigarette lighter charger plugged in and it is not broken.

Page 13
07-502
Report

The rear part of the console has a significantly elevated armrest cargo area that the fabric armrest is still in place and exhibits no damage although it does not latch.

Again there is no deviation or shifting of this part of the console.

The lower foot control pedals are undeformed.

The lower fascia beneath the column is in place but slightly dislodged. There is a fracture just to the left of midline of the lower most portions.

There is no other damage or any obvious occupant contact marks with this structure.

The odometer is electronic and can not be read however this vehicle is only a couple of days old.

The instrument cluster is intact and undamaged.
The left outboard directional air louver is in place and undamaged.

The control levers on the column are undeformed.

This is a tilt column and it is in the up position such that the hub angle is approximately 32-35 degrees.

There is a driver's side airbag that has not deployed.

The steering wheel rim and hub assembly exhibits no asymmetry although there is some dirt covering portions of it.

There is a passenger assist grip located in the left A pillar. It is somewhat bent around the outboard portion of the A pillar. Also on the interior lower portion of the handle there appears to be what appears to be some buffing.

This buff is about an inch plus or minus in length.

The front seats are reclining bucket seats with adjustable headrests.

These seats are manually adjustable on the tracks.

They have manual recliner handles.

Presently the passenger seat is located what appears to be full rear on the tracks so there are at least approximately 24 open windows from the front.

The #3 seat cushion and back exhibit no deformity.

Page 14
07-502
Report

The #3 headrest is in the third notch up position. Presently the upper portion of the #3 headrest is compressed and bent due to the downwardly deformed roof.

The driver's seat cushion appears to be shifted from right to left or outboard.

The seatback also has a similar shift to it with possibly a slight counterclockwise rotation.

The driver's headrest is in the full down position and doesn't appear to be deformed.

On the very top basically near the midline of the driver's headrest there is a buffed slight punctured area noted.

On the roof rail just behind the B pillar on the driver's side there is another grab handle that is rotated out basically the plane of the left rear door window.

At the forward upper attachment of this to the headliner there is a single long curly darkly pigmented hair trapped.
There is a lot of dirt and mud staining in the headliner all above the driver's position.

On the driver's B pillar trim there is some greasy looking substances in several places with some dirt adherent to it.

The driver's door interior trim panel is intact from the armrest down. There is some fracturing at the rear portion of the armrest area that is a somewhat vertical serpentine type fracture with some whitish U-shaped stressing at the bottom of the fracture line.

Forward of this just under the grab handle or the cutout for the grab area there is what may be a buffed area as well.

The forward lower portion of the armrest area where the power window modules were is also broken loose from the door panel.

The speaker and map pocket are in place.

The upper portion above the armrest to the belt line is absent and found in the back of the vehicle as previously dictated.

On the rear plastic sheeting inside of the door panel cover there is some dirt and sort of greasy looking substances within it.

Also of note, trapped between the B pillar exterior door opening flange and the door panel is a pair of black panties or what appears to be panties that are shredded and pinched in there and hanging down to the rocker area.

Page 15
07-502
Report

Also within this area that it was pinched from the scene photographs was noted the gray nylon pants with white liner that the decedent was wearing. These are found clipped to the driver's belt and also show what appears to be some blood staining on the white liner.

Again these were all pinched between the exterior B pillar door opening and the driver's door just above the armrest area.

Also from the scene photographs it appeared that the lap belt was pinched in this area and there is in fact on the webbing noted around the 16 inch mark from the bottom of the lower outboard anchorage numerous picks and abraded and punctured areas on the webbing.

Of noted is that there is essentially no grossly obvious blood noted within the interior of the vehicle or anywhere around the driver's position.

There is an overhead console between the two visors that is in place but covered in mud but exhibits no fractures or any obvious damage by occupant contact.

The driver's seat as stated earlier is shifted from right to left and the inboard track is somewhat rotated outboard.

The seat is noted to be located such that on the inboard track along where the buckle is mounted to the seat track there are five open windows noted on the slider.

Also looking underneath there are approximately 11 open windows from the front.

The B pillar trim is intact on the driver's side and other than the greasy looking substances and some dirt staining shows no fracturing or any obvious buffs or abrasions.

The front seat restraints are three-point what are most probably vehicle and belt sensitive restraints with single loop pass-through latch plates and B pillar mounted adjustable D rings.

The #3 belt becomes an ALR when fully extended.

The belts are manufactured by Takata Corporation.

The front restraints also have top release plastic housed buckles on metal stalks anchored to the seat.

The following will be dictation for the driver's restraint:

The driver's restraint is found with the latch plate engaged in the buckle and the webbing is pinched and crimped within the upper shoulder D ring and additionally the webbing is locked between the D ring and the retractor such that no more belt can be paid out and due to it being pinched will not retract back.

The latch plate D ring on both sides shows heavy and excessive melting of the plastic and load marks from edge to edge with the melted plastic almost extending from the cutout in the pass-through latch plate up to the top of the latch plate.

On the driver's belt webbing on the non-label side beginning at the 14 inch mark to about the 18 ½ inch mark the webbing as previously described is picked, punctured, indented, abraded.

On the back side in this same area there is some similar although not quite as heavy abrasion as well.

The webbing is noted to be somewhat roped on the non-label side or is somewhat roped beginning at about the 23 inch mark extending to about the 30 inch mark.

There are a few areas of brownish staining noted on the non-label side of the webbing at the 30 ½ inch mark, the 32 ¾ to 33 ½ inch mark.

On the label side of the webbing beginning around the 46 inch mark and extending to approximately 50 ½ to ¾ inch mark there is an area of etched edge of plastic transfer noted on the webbing.

Again beginning at about 57 1/2 inch mark and extending to approximately 64 inches there is some heavy brownish staining or some substances embedded in the webbing as well as it being somewhat buffed.

On the back side of the webbing again beginning at about 59 and extending all the way up to the D ring at approximately 69 ½ inches there is heavy roping and abrasion and also some more dark transfer and in fact looks like the belt has been almost folded over.

From the D ring down to the retractor starting at the D ring there is approximately 3 inches of webbing that is buffed and looks like it has plastic transfer on it as well as being roped.

From the D ring down to the cutout and the B pillar is 7 ¾ inches.

There is approximately 2 inches between the bolt that mounts the driver's buckle from the face of it to the edge of the center console.

The driver's buckle has been bent and moved outboard.

Additionally the driver's buckle appears to be more of a rearward angle as compared to the range of motion of the #3 buckle.

And there is an indentation in the metal flange where it has been bent and pulled into it moving laterally outboard.

Page 17
07-502
Report

The following are measurements for the driver's position:

Seatback angle is 35 degrees.

Seatback height is 23 inches and with headrest is 29 ½ inches.

Seat cushion angle is 12 degrees.

Seat cushion depth is 19 inches.

Bight to roof is 34 inches and 6 inches forward is 31 ½ inches.

Outer edge of seat cushion at the bight to roof rail is 29 ½.

Top of head rest to roof is 6 inches aft assist grip anchor.

D ring is 1 ½ inches in of out edge head rail.
The rail is approximately 4 inches inboard of the outer edge of the seat cushion.

Hub to seatback is 21 inches.

Left leading edge of seat cushion to dash is 8 ½ inches.

Bight to belt line opening is 18 inches.

The horizontal door opening as measured from the dash to the B pillar is 26 inches.

Window opening is 26 ½ inches by 16 inches.

Face of head rest is approximately 1 ¾ inches behind back of B pillar.

Rocker to roof rail just forward of B pillar is 37 5/8 inches.

Rocker to roof rail A pillar head rail junction is 36 ½ inches.

Left rear door window opening is 29 ½ inches by 16 ¼ inches.

Measurements for the #3 position:

Rocker to roof rail just forward of B pillar is 33 ½ inches.

Rocker to roof rail A pillar head rail junction is 30 ½ inches

### 6) NOTES MADE AT THE TIME OF SURROGATE STUDY (LISTED AS DICTATED AT TIME OF EXAM):

The surrogate study is taking place on January 12, 2007 at Weil Wrecker Service in Birmingham, AL. Present at the study are Paul Lewis, Jr. and attorney Michael Strickland.

The exemplar vehicle is a 1998 Mitsubishi Montero Sport 4-Door.
It has VIN: # JA4lS31P4WP029953.

The surrogate is Anna Fannin. She is a 20 year old female with a height of 5'3 ½" with ½ inch heels and a weight of 138 pounds.

She has a seated height of 32 ½ inches.

She has a buttock to knee length of 22 inches.

I placed the seat as found in subject vehicle with 11 open windows from the front, and a seatback angle of 35 degrees.
The D ring is full up.

The zero point for the restraint measurements is at the bottom lower outboard anchorage.

The measurement at the latch plate is 38 inches.

The measurement at the D ring is 70 ¾ inches.

The measurement at the surrogate's mid chest point is 52 inches.

Under the surrogate's right breast, the measurement is 47 inches.

From the top of the surrogate's head to the roof is 8 inches.

From the left side of the surrogate's head to the roof rail is 7 ¾ inches.

From the surrogate's knee to the dash is 5 inches.

From the center line of the hub to the chest is 13 ¾ inches.

Next, I placed the surrogate in the subject vehicle.

The zero point for the restraint is still at the bottom lower outboard anchorage.

The measurement at the latch plate is 35 ½ inches.

The measurement at the D ring with the slack is 69 ½ inches.

Page 19
07-502
Report

The measurement at the D ring with the slack out is 63 inches.

From the top of the surrogate's head to the roof is 5 inches.

The left side of the surrogate's head basically meets the roof rail.

From the surrogate's knee to the dash is 4 ½ inches.

From the surrogate's chest to the center line of the hub is 14 ¾ inches

**(End Section 2)**

Page 20
07-502
Report

## <u>Section #3: Opinions and Support of Opinions</u>

1) **It is my opinion that the injuries sustained by Dora Parker resulting in her death as a consequence of the subject motor vehicle crash incident were comprised of a total body amputation of the upper torso from the lower torso at the waist area. These injuries are clearly documented in the available photographs.**

    a) Photographs taken depict this obvious traumatic amputation.

    -    Below are photographs that were taken at the scene of the accident showing the separated upper and lower torso:

Page 21
07-502
Report

- Below are photographs taken at the Coroner's Office that depict this obvious traumatic amputation in further detail:

- Image# 0192742-RI-026-1 shows in detail the lower part of the amputation from the waist line down:

**(Image# 0192742-RI-026-1)**

- Image# 0192742-RI-015-6 shows in detail the upper part of the amputation including stretch-like abrasions along the lower margin of the abdomen:

**(Image# 0192742-RI-015-6)**

Page 22
07-502
Report

     b)  Other injuries noted in photographs taken at the funeral home are as follows:

-     Image # 0192742-RI-007-2 shows a linear black abrasion to her right upper arm/shoulder area and an open small wound to the front of her arm at the elbow area:

**(Image # 0192742-RI-007-2)**

-     Image #0192742-RI-028-12A is a close up view of the surface of her abdomen that shows multiple abrasions.

**(Image #0192742-RI-028-12A)**

Page 23
07-502
Report

-     Image #0192742-RI-029-13 shows her back to also have numerous abrasions/contusions.

**(Image #0192742-RI-029-13)**

-     Image #0192742-RI-040-18A shows the left side of her neck to have a bank-like area of abrasion extending under her chin up toward her left ear in two directions and continues toward her right ear consistent with severe abrasion from the shoulder belt.

**(Image #0192742-RI-040-18A)**

Page 24
07-502
Report

- Image #0192742-RI-038-17A shows the right side of her neck with continuation of the linear abrasion as well as some small superficial lacerations.

**(Image #0192742-RI-038-17A)**

- Image #0192742-RI-021-9 is an up close view of a portion of her head which appears to show dried blood in both of her nostrils and mouth.

**(Image #0192742-RI-021-9)**

Page 25
07-502
Report

- Image #0192742-RI-019-8 shows the front of her neck and upper chest area where bruising and abrasions is visible over the shoulder/upper chest area.

**(Image #0192742-RI-019-8)**

2) **It is my opinion that Dora Parker was utilizing her available three point restraint at the time of the incident.**

**Support for this opinion is as follows:**

a) The accident report lists her as a restrained occupant and further states in the narrative that the driver side seatbelt was buckled indicating the driver was wearing it at the time of the collision.

b) Photograph taken at the scene shows the latchplate still engaged in the buckle stalk (see below):

Page 26
07-502
Report



c) Evidence of the driver's belt being in use at the time of the accident was found during my personal vehicle inspection. This evidence is documented in my above listed vehicle exam notes and is specifically as follows (listed as dictated in notes):

The driver's restraint is found with the latch plate engaged in the buckle and the webbing is pinched and crimped within the upper shoulder D ring and additionally the webbing is locked between the D ring and the retractor such that no more belt can be paid out and due to it being pinched will not retract back.

The latch plate D ring on both sides shows heavy and excessive melting of the plastic and load marks from edge to edge with the melted plastic almost extending from the cutout in the pass-through latch plate up to the top of the latch plate.

Page 27
07-502
Report



**(Burton & Associates Photograph No. DSCN0050 and DSCN0052)**

On the driver's belt webbing on the non-label side beginning at the 14 inch mark to about the 18 ½ inch mark the webbing as previously described is picked, punctured, indented, abraded.

On the back side in this same area there is some similar although not quite as heavy abrasion as well.

The webbing is noted to be somewhat roped on the non-label side or is somewhat roped beginning at about the 23 inch mark extending to about the 30 inch mark.

There are a few areas of brownish staining noted on the non-label side of the webbing at the 30 ½ inch mark, the 32 ¾ to 33 ½ inch mark.

On the label side of the webbing beginning around the 46 inch mark and extending to approximately 50 ½ to ¾ inch mark there is an area of edge to edge of plastic transfer noted on the webbing.



**(Burton & Associates Photograph No. DSCN0062)**

Page 28
07-502
Report

Again beginning at about 57 1/2 inch mark and extending to approximately 64 inches there is some heavy brownish staining or some substances embedded in the webbing as well as it being somewhat buffed.



**(Burton & Associates Photograph No. DSCN0133)**

On the back side of the webbing again beginning at about 59 and extending all the way up to the D ring at approximately 69 ½ inches there is heavy roping and abrasion and also some more dark transfer and in fact looks like the belt has been almost folded over.

From the D ring down to the retractor starting at the D ring there is approximately 3 inches of webbing that is buffed and looks like it has plastic transfer on it as well as being roped (reference below photograph).



**(Burton & Associates Photograph No. DSCN0057)**

The driver's buckle has been bent and moved outboard.

Additionally the driver's buckle appears to be more of a rearward angle as compared to the range of motion of the #3 buckle.

And there is an indentation in the metal flange where it has been bent and pulled into it moving laterally outboard.

3) **My opinion regarding the kinematics of Dora Parker in the subject vehicle during the incident as relates to the occurrence of her fatal injuries is a follows:**

a) I have assumed this incident occurred as described in the accident report and information from Engineer Rudy Limpert. The subject 2003 Mitsubishi Montero driven by Dora Parker was traveling southbound on Interstate 65 within the inside lane. The vehicle moved to the left and entered the unpaved grass median and began to rotate in a clockwise direction before rolling at least three times before coming to rest upright facing east.

b) During the first ¼ roll in the driver's side leading roll Dora would have the tendency to move to the left side of the vehicle as it decelerates both from the clockwise yaw and from the "trip".

c) During this first 90 degrees of roll the emergency locking retractor for Dora should have locked.

d) The locked up retractor would still allow her to unload her seat cushion to some degree and her center of mass to move slightly to her left being

restrained by her own conscious effort and by the belt restraint assuming it has locked up.

e)  As the vehicle continues to roll to 180 degrees and then onto its wheels her head would move, due to centrifugal forces, laterally toward her adjacent roof panel and roof rail and the left side of the vehicle.

f)  As the vehicle has rolled through its first roll, the potential for the loss of glazing on both driver and passenger side windows has occurred. This is most probably due to roof, pillar and window flexion due to vehicle to ground impacts.

g)  As the vehicle enters its second roll the movements of the Dora are still dictated by the laws of force and motion, the forces primarily consisting of gravity, centrifugal forces, centripetal forces, and combinations of these.

h)  At some point in time after the first roll the driver's door has the ability to open. Once the door opens, this portion of the restraint system can no longer provide resistance to Dora's lateral outboard movement.

i)  Her pelvis is now capable of continuing its lateral excursion outboard. This is due to the fact that during the roll and as deformation occurs in the B Pillar to which the belt restraint is mounted, slack can be induced into the belt restraint system and in as much as this is a pass through latchplate system, once slack is introduced into the shoulder belt, can be then passed through to the lap belt.

j)  This additional slack again aids in the ability of the pelvis to move laterally outboard off the seat cushion. Once the buttocks are at least half or more off of the seat cushion, it then no longer has any resistance and can simply drop off the seat.

k)  During this motion the shoulder belt, as evidenced by the heavy abrasions noted from ear to ear on Dora Bernard's body, is wrapped around her head and nearly decapitates her. Finally her head slips out from underneath the shoulder belt and outside the vehicle.

l)  Once her head has slipped from underneath the shoulder belt, she is simply restrained or wrapped within the lap belt. Her body is allowed to move outside the confines of the vehicle due to the door being open.

m) During this partial ejection event it is likely that there was some interaction of her body with some portion of the vehicle as it was rolling.

n)  As the vehicle continues rolling the lap belt then is continuing a "sawing" type motion with her body and forces trying to continue pulling her

through the belt begins cutting through the soft tissues and eventually breaks through the spinal column.

o)  Once the body has been severed the upper torso portion simply drops out and is found in the location at the scene as noted by the scene photographs with what appears to be the upper portion of the driver's door interior trim panel laying next to the body.

p)  The vehicle then continues its roll to rest with the lower torso simply being still hung up or attached either with a flap of skin around the belt webbing and or some other means and ultimately is flung behind the final rest of the vehicle to the position noted in the scene photographs.

**Support for my opinion concerning the kinematics of Dora Parker can be found in the following:**

a)  I have considered my vehicle examination, surrogate examination, evaluation of scene photographs and the reconstruction information in forming my opinions regarding Dora's kinematics.

b)  I have considered the laws of force and motion, i.e. Newton's Laws, in applying the occupant's movement to the dynamics of the vehicle.

c)  The kinematics of occupants in rollovers have been studied for a number of decades. The kinematics have been described in the rollover literature. The kinematics of occupants in rollovers including half rolls can be viewed in numerous rollover studies done both during research and development and for litigation.[1]

d)  I have considered my own personal evaluation of close to 809 individual rollover cases which I have reviewed as an investigator and consultant.[2]

e)  I have considered a specific portion of this cases that I have reviewed that involve decapitation and or some means of amputation.[3]

f)  I have considered what other automotive safety experts have testified to and described in numerous rollover cases where I have studied and reviewed their various testimonies concerning occupant kinematics in these numerous rollover cases.

---

[1]  Rollover Bibliography
[2]  Rollover Case List
[3]  Decapitation List

Page 32
07-502
Report

4) **It is my opinion that the primary injury that occurred to Dora Parker, i.e.
the traumatic amputation of her upper body from her lower body, was the
consequence of her body's partial ejection, then full ejection from the vehicle
during the subject incident. These injuries were not the consequence of her
body's interaction with any of the interior components of the vehicle during
the rollover.**

   **Support for this opinion can be found in the following:**

   a) Fully contained occupants in laterally rolling vehicles are not subject to
      critical to life threatening injuries.

   b) This is supported by all of the literature even dating back to papers written
      in the late 70s and early 80s by Dr. Moffatt and Dr. Huelke.[4]

   c) Currently studies show that for restrained occupants who are contained in
      the vehicle there is less than a 3% chance of fatality.[5]

   d) All studies, again dating back for several decades, indicate the greatest
      harm to an occupant in a rollover is associated with that occupant's partial
      or complete ejection from the vehicle.

   e) There are no studies available, to my knowledge, that would indicate that
      the injuries sustained by Dora, again, the traumatic amputation of her
      upper torso from her lower torso, is something that could or would occur
      within the confines of this vehicle under almost any circumstance.

   f) A search of my current database as a consultant of 809 rollover crashes
      reveals no other cases where this type of traumatic amputation has
      occurred to an occupant fully contained in a vehicle during a rollover.

   g) As Dora Parker's body is partially ejected from the vehicle the polyester
      belt webbing, which has a tensile strength of 4,000 to 5,000 pounds before
      it would break, is restraining her body which is being moved outboard by
      lateral acceleration forces varying between less than 1 to up to potentially
      several Gs.

   h) The 2 inch wide belt is collapsing her abdominal wall and eventually
      results in the fatal injury to her abdominal area.

[4]    Rollover Bibliography
[5]    Digges, Kennerly; "Summary Report of Rollover Crashes", Prepared for the National Crash
Analysis Center, June 2002

Page 33
07-502
Report

    i) No such injuries have been documented in the literature associated with contained occupants in lateral rollovers to my knowledge.

**5) It is my opinion that the apparent opening of the left front door was proximally related to the partial then full ejection of Dora Parker and contributed to the traumatic amputation that caused her death.**

**6) It is my opinion that had the left front door not opened and had Dora Parker received adequate restraint from her belt restraint system, then she would have not been partially and then fully ejected from the subject vehicle and sustained the catastrophic injury resulting in her death. Instead, her injuries would have been consistent with those described in the literature previously referenced. Her injuries would be of an AIS 1, 2 or 3 level severity.** [6,7,8]

**Support for opinion #5 and opinion #6 can be found in the following:**

    a) My surrogate study clearly showed that had Dora Parker simply been contained in the vehicle that she would have had adequate occupant survival space. Reference below photographs demonstrating this:



**(Burton & Associates Photo No. DSCN0113)**

---

[6]     Huelke and Compton, 1983 (#16 on Rollover Bibliography)

[7]     Malliaris and, Digges  (#55 on Rollover Bibliography)

[8]     AIS Injury Scale

Page 34
07-502
Report



(Burton & Associates Photo No. DSCN0117)



(Burton & Associates Photo No. DSCN0118)



(Burton & Associates Photo No. DSCN0119)

b) Ford Motor Company's database shows that when a door opens the chance of an occupant ejection is increased 20 fold.[9]

c) Studies have shown that body mounted belt systems cannot prevent an occupant's partial or complete ejection from the vehicle when the door, which is part of the occupant containment package, has opened.[10]

d) There is no medical or scientific evidence to suggest that the catastrophic injuries which have been described would have occurred within the occupant space of the subject vehicle during this lateral rollover.

e) Although neck injuries can occur to occupants contained in a vehicle, neck injuries of the catastrophic type are most commonly associated when there is significant vertical loss of the occupant space over the occupant position.

f) Although there is inboard and downward movement of the right side roof and roof rail, a properly operating belt system, especially an All Belts to Seat that locked up in a timely manner should have prevented her body's motion into the roof and adjacent structures to such an extent that a catastrophic neck injury would not have occurred.

g) Dora Parker's apparent seated height, assuming her stature to be 5'3" would have been approximately 32 to 33 inches.

h) Studies have shown that belt integrated seats and single loop body mounted belts and single loop belts with the outboard lower anchor attached to the seat itself significantly reduce lateral and vertical excursions.[11]

i) Additionally, Moffatt, Cooper, et al, in SAE Article 973347 performed studies with Hybrid III ATD's utilizing both fixed and pedestrian pelvises and cinching and sliding latchplates, as well as testing with cadavers with sliding and cinching latchplates, and some static studies with volunteers, utilzing sliding and cinching latchplates. This database is not consistent with other statements made in similar articles by the same authors. [12]

9     Hultman, R.W., "Evaluation of Occupant Ejection Rates and Door Openings in Passenger Cars", Ford Inter-Office Memo, November 6, 1980.

10    Malliaris, A.C., DeBlois, J.H., Digges, K.H. Digges, "Light Vehicle Occupant Ejections- A Comprehensive Investigation", *Accident Analysis & Prevention*, Vol. 28, No. 1, January 1996 (#2 on Rollover Bibliography)

11    Pywell, James; Rouhana, Stephen; McCleary, Joseph; DeSaele, Kenneth, "Characterization of Belt Restraint Systems in Quasistatic Vehicle Rollover Tests", SAE No. 973334 (#19 on Rollover With "Roof Crush" & Neck Injury Bibliography)

12    Moffatt, Edward; Cooper, Eddie; Croteau, Jeffrey; Parenteau, Chantal; Toglia, Angelo; "Head Excursion of Seat Belted Cadaver, Volunteers and Hybrid III ATD in Dynamic/Static Rollover Fixture", SAE No. 973347 (#10 on Rollover With "Roof Crush" & Neck Injury Bibliography)

Page 36
07-502
Report

j)  In fact, if one compares the static excursion tests for the cadavers with like restraints, i.e. sliding latchplates and without pretensioning, the single static cadaver tests reported in Paper No. 973347 shows a static excursion of the head of 165 mm. In the dynamic head excursion test (reference Appendix 2 of this paper) there are four cadaver sliding latchplate tests. None of the dynamic excursions reach 160 mm indicating that the rotational accelerations of the test fixture cause the cadaver to not hang statically and elongate and get further extension. In one of these tests without pretensioning the dynamic excursion of a cadaver was only 45 mm and the maximum 145 mm giving an average of 130 mm of excursion dynamically.

k)  In this same study the dynamic tests with Hybrid IIIs where sliding latchplates are used (no sliding latchplate was used with a pedestrian pelvis for some reason) the two dynamic excursions resulted in 85 and 60 mm of excursion giving an average dynamic excursion of the Hybrid III dummies of 60 mm.

l)  Even this was less than the average excursion of the Hybrid III with seated pelvises in the static test which average 67.4 mm.

m) These studies serve to prove what one would predict from the actual physics of an incident that with the door remaining closed and lateral accelerations trying to hold the occupant against the door, that in the dynamic process of the rollover, vertical excursions are limited in part by this process as well as by the effectiveness or lack of effectiveness of the belt restraints.

n)  All of the studies, including those of Pywell, Malliaris and Digges and Moffatt and Cooper's Paper conclude that torso belts reduce vertical head excursion by restricting forward rotation of the torso and that a torso belt whose D ring is close to the shoulder provides an additional benefit from vertical restraint to the shoulder.[13]

o)  Based on all of the reference papers and research the theory of coupling an occupant to the seat in all crashes, including rollovers, clearly demonstrates that if one can preserve the occupant space with minimal deformation that a restraint that better couples the occupant to the seat can prevent both vertical and lateral excursion and thus torso augmentation loading through the body to the neck and loading through the loss of vertical occupant space or the creation of negative head room by pillar collapse.

---

[13]  Rollover Bibliography

p) All of the above serves as further proof that had the occupant space been preserved, the door remained closed, and a belt restraint system working optimally to couple Dora Parker to the seat and to reduce her dynamic vertical and lateral excursion that it would be unlikely, even without the glazing in place, for her head to extend out of the plane of the window and potentially receive some type of head and/or neck injury from head to ground contact, even with the door closed.

q) Additionally, with such restraint and containment with preservation of the occupant space, which has known to be key to the protection of occupants in all types of crashes for at least 5 decades, a properly performing restraint of the All Belts to Seat type, a body mounted belt with the inboard lap belt anchor moved to the seat as described in Pywell's previous referenced article and certainly pretensioning these systems with a rollover sensitive pretensioner would have virtually guaranteed that Dora Parker would have survived this crash with injuries like those of her husband and son.

r) Simply keeping the door closed would have prevented Dora Parker's injuries.

**(End Section 3)**

Page 38
07-502
Report

## <u>Section #4: Consideration for the Potential of Error</u>

There is virtually no error in my opinions concerning the general kinematics of Dora Parker.

I have considered the laws of force and motion, the specific reconstruction of this case, the appearance of the subject vehicle, the injuries sustained by Dora and testimony and research articles written by numerous other experts including experts currently testifying for major auto manufacturers.

There is virtually no chance of error in my description of the injuries sustained by Dora. These are clearly visible in photographs.

There is virtually no chance of error in my opinion that had Dora been contained within the vehicle that she would not have sustained life threatening injury.

I have given numerous references in the literature from alleged peer reviewed papers supporting this conclusion. My own personal research of which I have attached summaries of the cases and those in which there are contained occupants with head injuries supports this conclusion.

My opinion concerning the degradation and performance of the belt restraint system by the roof deformation is not subject to error. This is something that can be proved using mathematics including geometry and simple methods of calculation.

There is no chance of error in my opinion that belt integrated seats and pretensioned belts would better couple an occupant to the seat and serve to prevent occupant protection even if window glazing was lost. All such studies are consistent with this opinion.

The error rate for clinical impressions such as these are difficult to actually calculate and give a number or percent error probability.

The concept of error rate applies well to other types of investigations, such as statistical analyses, animal studies or human exposure studies of toxicity, or other studies of aggregated data. It is not a particularly applicable concept with respect to forensic evaluation of injury causation in a specific case.

The opinions I have given, however, have been to a reasonable degree of forensic scientific and biomedical engineering probability and certainty.

The methodology that I have used in my approach to this case employed the scientific method of analysis.

"Consideration of Error" is somewhat applicable to the court's consideration of "falsifiability" of the expert's opinion.

Page 39
07-502
Report

There is no "percent of error" that can be determined for virtually anything other than some type of actual test procedure in which a likelihood of error by the testing machine or the mathematical formula or theory can be produced.

Clinical and scientific, medical and other opinions are testable as to whether there is substantial risk of error simply by looking at all of the supporting documentation and evidence that would lend credibility to the opinion.

If the overwhelming body of knowledge is such that the opinions are in opposition to such then a question as to the credibility or the likelihood of error of the opinion can be considered.

If, however, there is a substantial body of literature, research and education, background and training of the expert to support the opinion then the opinion should meet the requirement of reasonable scientific probability.

All of the opinions which I have given within the body of this report reach and exceed the minimal requirement of "probability".

They are supported by extensive references to the literature, to research and my training, education and experience that I have utilized in my analysis of this case.

They are supported by my specific training in analyzing motor vehicle crashes as a biomedical engineer including training in the area of the basic principles of physics including force and motion principles.

They are additionally supported by my research, testing and utilizing car to car crashes, sled tests, spit tests, Hyge sled tests and evaluating injury potential for occupants in various crash modes and in various levels of forces.

Furthermore, they are supported by my experience in investigating automotive crashes where I as an intern for the medical examiner's office assisted in the removal of bodies from automobile crashes, as well as other types of scenes, and further assisted in the postmortem autopsy and determination of injuries resulting from the specific trauma event.

Based on all of the above I believe that my opinions satisfy the concept of exceeding some level of error that would result in these opinions being speculative or falsifiable.

Certainly, the methodology that I have employed in the investigation of this case, as well as the other cases with which I become involved, comports to the scientific method of inquiry.

Within the methodology of the Scientific Method there is no requirement that a test be done. The requirement is that the opinion be tested in some way. The method of testing

Page 40
07-502
Report

may simply involve, according to the literature, comparing the opinion in the subject case to similar cases investigated by the scientists and/or others with previous similar endeavors and tasks.

The above opinions are based on my current understanding of the case based on the specific data that I have evaluated, the condition of the subject vehicle which I personally inspected, my personal evaluation of the various photographic evidence submitted with the case file and on my education, background and training.

If further or additional information becomes available of significance that might in any way impact the opinions which I have currently offered I will re-evaluate such opinions and potentially amend or expand such.

**(End Section 4)**